MESA RANCH PARTNERSHIP

v.

The UNITED STATES.

No. 296–82L.

United States Claims Court.

June 21, 1983.

Frank Lee Crist, Jr., Palo Alto, Cal., for plaintiff; Crist, Griffiths, Bryant, Schulz, Biorn & Clohan, Palo Alto, Cal., of counsel.

Dorothy R. Burakreis, Washington, D.C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D.C., for defendant; David R. Collins, Seattle, Wash., of counsel.

OPINION

LYDON, Judge:

This case is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment and plaintiff's opposition thereto. In its complaint, plaintiff, Mesa Ranch Partnership (Mesa Ranch), seeks to recover just compensation for the alleged taking of its property by defendant. Defendant, in its motion, argues that the present action is barred by *res judicata* because no further significant action has been taken by the government since the United States Court of Claims dismissed the

same taking claim advanced by plaintiff in *Mesa Ranch Partnership v. United States,* 222 Ct.Cl. 623, 650 F.2d 285 (Order Feb. 8, 1980). Defendant further asserts that it has not impermissibly restricted plaintiff's property so as to constitute a taking and that there is no genuine issue of material fact which would serve to preclude denial of its motion. Plaintiff, on the other hand, claims that *res judicata,* on the facts presented, is inapplicable; that it has sufficiently pled a cause of action for a taking; and that there are genuine issues of material fact which require a trial. Both parties have submitted a number of documents and affidavits in support of these positions which are discussed in full in their briefs.

## I.

### A. *The Prior Decision*

Plaintiff filed the instant action approximately 2 years after the United States Court of Claims dismissed its previous inverse condemnation action concerning the same property. In the prior action, referred to herein as *Mesa Ranch I,* plaintiff sought to recover just compensation for an alleged taking of its property, known as Mesa Ranch, a 210 acre tract of land in Marin County, California, bordering on the Pacific Ocean and adjacent to Point Reyes National Seashore. Plaintiff acquired the property in 1971 when it was zoned for residential-agricultural use. The property is deemed suitable for a subdivision of approximately 1,000 units. Mesa Ranch is the last remaining unimproved parcel of privately-held coastal land in Marin and San Francisco counties. The highest and best use of the property, if not for parkland or recreation, is for residential purposes.

In support of its prior "taking" action, in *Mesa Ranch I,* plaintiff argued that certain activities by the federal government, constituted a taking, entitling plaintiff to just compensation.

First, plaintiff argued that the federal government, operating through Congressman John L. Burton and Interior Department personnel, persuaded the county to "down-zone" the Mesa Ranch property as part of a plan to prevent or delay plaintiff from developing the property. On August 23, 1977, Marin County "down-zoned" the property to reduce the prior residential lot yield from 1000 to 10 units, which served, according to plaintiff, to depress the market value of the tract and thus would enable the government to acquire it at a lower price.

Second, plaintiff relied on Congress' 1978 adoption of a revised map of the Point Reyes National Seashore, which added plaintiffs' 210-acre tract to the previous statutory boundaries of that National Seashore as evidence that a taking had occurred.

Third, plaintiff argued that on May 18, 1979, the government informed plaintiff that it would acquire Mesa Ranch at some undetermined future date when funds were available.

As a result of the aforementioned governmental actions with respect to plaintiff's property, plaintiff claimed that its land was unmarketable and that a taking thereof had occurred. The Court of Claims responded to each of these arguments in *Mesa Ranch I.*

The Court of Claims, citing *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 424 F.2d 574 (1970), held "that acts of federal officials in persuading local officials to obstruct development by placing new burdens upon it, or refusing to lift old ones, are not takings imputable to the United States." (222 Ct.Cl. at 626, 650 F.2d 285). The court also held that inclusion of plaintiff's property in the revised statutory map of the National Seashore did not constitute a taking. Rather, the court viewed publication of the revised map as merely an "inchoate taking" of lands shown on the map, with the taking remaining to be perfected by further official action (222 Ct.Cl. at 625, 650 F.2d 285). Finally, after also considering the government's announced intention of acquiring Mesa Ranch at some future date, the court concluded that the aforementioned government actions were insufficient to accelerate the time of title pas-

sage before the date of actual exchange, purchase, or condemnation. (222 Ct.Cl. at 625, 650 F.2d 285.) Accordingly, the court dismissed plaintiff's petition.[1] The court did state, however, that "we are careful to leave open the possibility that future events, or nonevents, too late to be sued on here, might ripen into a taking, as to which we make no adjudication." (222 Ct.Cl. at 626, 650 F.2d 285.)

Since *Mesa Ranch I* was decided, certain undisputed new events have occurred with respect to plaintiff's property. The significance of these subsequent actions, vis-a-vis the government's *res judicata* defense, is at issue in this case.

### B. *The Subsequent Events*

On February 15, 1980, shortly after the Court of Claims decision in *Mesa Ranch I,* the government sent plaintiff·a draft Land Acquisition Plan that was prepared by the Department of Interior (DOI). The purpose of the plan was to inform owners of private land within the authorized boundaries of Point Reyes National Seashore concerning the land acquisition program for the park, the plan's effect on individual landowners, and the manner in which those concerned could submit their comments on the plan. The draft plan, which was subsequently approved in *toto* as the final Land Acquisition Program in April 1980, states that " * * * full fee title will ordinarily be acquired to provide for the full use and enjoyment of all the land within the exterior boundary by all of the citizens."

The plan established acquisition priorities as follows: (1) prevention of resource damage, (2) hardship cases, (3) land needed for public facilities, (4) persons interested in selling and (5) all other lands. Although the plan specified certain properties as "current areas to be acquired," plaintiff's property was not among them. The plan also defines compatible and incompatible uses for the properties. Basically, general maintenance, repair and minor modification work is considered a "compatible" use,

while construction of buildings, subdivision development, or other improvements on undeveloped land are considered "incompatible" uses. The plan further states that:

Owners of inholding properties who intend to intensify the use of land or wish to perform other actions, which may be incompatible with Park purposes or damaging to the resources are encouraged to discuss contemplated use changes with the Park manager or his staff. (Address and telephone number below.) A change in use which is deemed incompatible will cause the Government to seek to acquire the property through eminent domain proceedings.

Condemnation proceedings are regarded by the National Park Service as a last resort. The Service will make settlement whereever possible before initiation of condemnation. Declarations of taking are typically used where title to this land must be vested in the United States immediately in order to prevent resource damage. Any declaration of taking must be approved by the appropriate Congressional Committees prior to action.

When the present owners anticipate a change in ownership, other than within the immediate family, they may want to notify the Service who may make an offer to purchase.

On July 17, 1980, several months after issuance of the final plan, DOI wrote to plaintiff informing it that, after appraising plaintiff's property, just compensation was established at $735,000. Enclosed with the July 17th letter was a form entitled, "Individual Offer to Sell Real Property." The "offer to sell" form provided that plaintiff would offer to sell Mesa Ranch to the government for $735,000. The form also provided that, once plaintiff signed the offer, the government would have 6 months from the date of the offer to accept it. However, plaintiff could withdraw or cancel its offer at anytime until the government had accepted it.

---

1. The court also dismissed plaintiff's implied contract claim, without discussion, stating simply that the "theory does not add anything."

*Mesa Ranch Partnership v. United States,* 222 Ct.Cl. 623, 626, 650 F.2d 285 (Order Feb. 8, 1980).

In August 1980, Anton Holter (Holter) and other Mesa Ranch representatives and Robert Easterling (Easterling), realty specialist for the National Park Service (NPS), met to discuss the sale of Mesa Ranch. Easterling informed Mesa Ranch representatives that, at present, there were funding problems and that acceptance of an offer to sell would be dependent upon the availability of funds.[2] On October 3, 1980, Easterling again met with Mesa Ranch representatives to negotiate the acquisition of the Mesa Ranch property. Mesa Ranch representatives offered to sell the property to the government for $1,050,000, an amount which it believed was the fair market value. Negotiations thereafter terminated without an agreement because of the differences of opinion as to the value of the property.

In March 1981 a stipulation for judgment was entered in a lawsuit that was pending between Mesa Ranch Partnership and the County of Marin. *Mesa Ranch Partnership v. County of Marin,* No. 78–0400 WH6 (N.D.Ca. Mar. 2, 1981). In this suit, plaintiff sought damages for an inverse condemnation claim against the United States as an "alleged agent," or, in the alternative, a mandatory injunction setting aside the downzoning of its property. The suit was dismissed against the United States and, in March 1981, the County of Marin and plaintiff agreed to a settlement whereby plaintiff would be permitted to develop the site with a minimum of 21 single-family residential units, as consistent with the goals of the Marin County General Plan. The stipulation also provided that, after plaintiff submitted a proposed rezoning and development plan, the Board of Supervisors Planning Commission and Planning Department of the County of Marin would consider allowing more than 21 units on the property. Furthermore, plaintiff would attempt to obtain the required coastal zone approval under the California Coastal Act as administered by the California Coastal Commission. Marin County, in turn, agreed to take steps in concert with plaintiff in an effort to arrive at a compromise between the conflicting requirements of the Commission and Marin County. The lawsuit, discussed above, was referred to in *Mesa Ranch I, supra,* 222 Ct.Cl. at 625, 650 F.2d 285.

On April 1, 1981, the California Coastal Commission certified, as complying with the requirements of the California Coastal Act of 1976, a Marin County zoning plan that zoned Mesa Ranch as C–ARP–20, allowing, *inter alia,* a maximum residential density of 1 dwelling unit per 20 acres. On May 19, 1981, Marin County adopted this zoning plan as part of its zoning district map and this zoning density edict has remained in effect to date.

On May 21, 1981, Holter telephoned Easterling to inquire about the feasibility of exchanging other federally-owned lands for the Mesa Ranch property. The NPS, pursuant to plaintiff's request, provided plaintiff with notices and descriptions of three available properties for a potential exchange for Mesa Ranch. The NPS did not specify the value of these excess lands. NPS received no response from plaintiff concerning these available for exchange properties.

About this same time, the California Coastal Commission approved two applications for coastal development permits for residential construction. The successful applicants were, like plaintiff, landowners of property located in the Golden Gate National Recreation Area, adjacent to Point Reyes National Seashore. Like plaintiff's property, these properties were also slated for acquisition by the Park Service. Relative to the resolution granting the development permits, the NPS stated: "[T]he National Park Service cannot deny or restrict a property owner from exercising his right of

---

**2.** The affidavit of Edward Haberlin (Haberlin), Chief, Land Resources Division, United States Department of Interior (DOI) states that although there were sufficient funds appropriated in fiscal year 1980 for the acquisition of Mesa Ranch, the government had expended the available funds in acquiring other properties between January and June of 1980. According to Haberlin's affidavit, if the offer from Mesa Ranch were deemed acceptable to the government, sufficient funds could have been obtained from other appropriated funds to effectuate acquisition of the property.

ownership, including development otherwise permitted by state and local planning or zoning authorities." The California Coastal Commission is empowered to deny development permits where there has been a specific authorization to acquire the property and where funds for such acquisition are reasonably expected to be available within one year. *Cal.Pub.Res.Code* § 30604(e) (1979). Because funds were not reasonably available for acquisition of the aforementioned properties, NPS could not deny the development permits.

In November 1981 plaintiff's applications at two lending institutions for new financing of the Mesa Ranch property were denied. The Redwood Bank denied the request " * * * based upon the uncertain timing of repayment as well as the speculative repayment sources." The Crocker National Bank refused to extend credit to plaintiff for the following reasons: "1. Strictly a 'Land Loan' with no structures on property, 2. Uncertain payoff from the U.S. Department of Interior, 3. Ability to service interest payments questionable." In its rejection letter, Crocker National also referred to plaintiff's property as a "nominal income producing asset."

On or about December 16, 1981, plaintiff contacted R. Davidge of DOI concerning the sale of Mesa Ranch. Holter of Mesa Ranch was informed that while the government was still interested in the property, funds were unavailable. In a follow-up letter, dated December 18, 1981, plaintiff claimed financial hardship as a result of DOI's avowed intention to acquire Mesa Ranch. In another letter to Davidge, dated January 11, 1982, plaintiff again claimed financial hardship and expressed its strong interests in selling the property to the government. In a third letter, dated January 22, 1982, Holter of Mesa Ranch Partnership informed Davidge that the Marin County Board of Supervisors had adopted a resolution requesting the California Coastal Commission to amend the Local Coast Plan to permit the development of 21 building sites on Mesa Ranch, which was necessary in order for Mesa Ranch to attain an increased building density. Holter also stated that plaintiff had submitted a preliminary plan to the Marin County Planning Department for the development of the property, conforming with the stipulated judgment entered between Mesa Ranch Partnership and the County of Marin. Holter further stated that while plaintiff " * * * will soon be in a position to commence the property's development * * * the only hindrance to this is the fact that the property has been designated for purchase by the Federal Government * * *." Holter reiterated his request that the government purchase the property as soon as possible. On March 25, 1982, Davidge responded to plaintiff's inquiries stating: "There are no funds available at the present time for the purchase of the property. * * * The National Park Service does not foresee any possibility of funding being available for this acquisition in this fiscal year."

On February 5, 1982, the California Coastal Commission denied Marin County's proposal to amend the Marin County Local Coastal Plan regarding Mesa Ranch. The Commission determined that the proposed amendment to permit the development of 21 building sites on Mesa Ranch raised substantial issues concerning the conformity of the proposal with public access, agricultural, visual resources, and public services provisions of the California Coastal Act.

On or about March 1, 1982, Easterling of DOI met with Holter to discuss the sale of Mesa Ranch. Easterling informed Holter that the government would reappraise the property and that if a price could be negotiated, he could probably convince the government to make the purchase. After this meeting, plaintiff had its own appraisal of the property performed.

On March 11, 1982, the California Coastal Commission advised Holter, by letter, of the remedial steps which should be taken in order to get further consideration of the proposed amendment by the Commission. The materials presently before the court indicate that no further action has been taken with respect to the proposed amendment by either plaintiff or Marin County.

Sometime thereafter in March 1982 plaintiff filed its master plan, development plan, tentative map and coastal permit application with Marin County. By letter dated April 22, 1982, Marin County responded to plaintiff's filings by requesting that it supply substantial amounts of additional information in order for the application to be deemed complete and ready to be processed.[3] The letter also stated that unless this information was received by May 22, 1982, plaintiff's application would be deemed withdrawn. Plaintiff's affiant, Holter, states that the cost of supplying the necessary information "would be a substantial sum of money," approximately $118,000 according to affiant-civil engineer Roy Hoffman. The letter also advised plaintiff of its right to appeal the decision as to the insufficiency of its application by April 29, 1982. There is nothing in the materials at hand to indicate that plaintiff has taken any further action with respect to its application: no appeal of the decision was filed and no additional information has been provided by plaintiff. In fact, seven extensions for supplying the requested information have been granted by the county.

Also in April 1982, Holter met with the government's appraiser to discuss Mesa Ranch with special reference to the filed master plan, development plan, tentative map, and coastal permit application for the development of said property. After several unsuccessful attempts at reaching an agreed price for the property with the government, plaintiff commenced the instant action in June 1982.

After filing the instant action, plaintiff, in February 1983, again received letters from three banks informing it that they would not loan money on the property at that time. Crocker National Bank stated that, according to its policy, it would not loan money on such a proposed development project "until all the necessary regulatory approvals have been obtained." In addition, Crocker National stated that the "uncertainty surrounding the possible acquisition of [the] property would have to be resolved before a loan could be considered. Should you obtain an unconditional commitment from the proper authorities regarding release or purchase of the property, I would be very interested in further discussions about providing financing."

The second letter, by Bank of America, refusing to extend credit states:

Although no formal loan request has been made, a review of the information presented indicates that it would be extremely difficult to grant credit * * * [b]ecause the property has been included in the boundaries of the Point Reyes National Seashore [and, therefore,] marketability is severely limited. The only apparent source or repayment of a loan on the property would be proceeds from the sale of the property to the U.S. Government. It is our understanding, however, that no funds are available for this purchase, nor is the government willing to enter into a purchase contract.

The third letter, from Wells Fargo Realty Finance, explained that it would not approve a loan because even though the government included Mesa Ranch in the national park map, there were no government funds appropriated for purchase of the property and the government has been unwilling to enter into a purchase contract. Wells Fargo, therefore, concluded that

---

**3.** Item No. 4 of the 12 items of additional information requested by the County states:

"4. Proof of access shall be submitted in the form of a title report accompanied by a map which covers a continuous road easement from a County maintained road (e.g. Mesa, Overlook or Alder) to the two proposed access points to the property (Juniper Road and Vine Road)."

The materials at hand, including both affidavits and various maps, indicate that while Mesa Road, a county road, is not adjacent to plaintiff's property and is separated from plaintiff's property by government-owned and privately-owned lands, plaintiff does, in fact, have access to its property through Poplar Road. Although Poplar Road is not a county-maintained road, there is nothing in the materials, nor in plaintiff's brief, to suggest that it does not eventually feed into a county-maintained road. The materials at hand suggest that feasible access to plaintiff's property continues to exist. Plaintiff does not allege that it has no feasible access to its property at this time.

without government funds there would be no funds with which to repay a loan. Wells Fargo further stated that repayment of the loan based on sale of subdivision lots would be unlikely given the government's expressed intention in acquiring Mesa Ranch.

Also in February 1983, Holter received from Jeffory Morshead, a real estate agent, the following response to his inquiry regarding the possibility of listing the Mesa Ranch property for sale.

> Though it's not often we refuse a listing, I have elected to do so in this case. Real estate brokers are required by law to make full disclosure of all factors which may affect the value of the property. We could, therefore, not offer the property without disclosing that the "210 acres .... will be acquired" by the United States Government. (A.W. Gray, Interior Dept., letter to you dated April 25, 1979). Under this threat I can not see any market for the sale of the property.

## II.

The question presented by defendant's motion in this case is whether, in light of the aforementioned facts and the decision in *Mesa Ranch I, supra,* the doctrine of *res judicata* serves to preclude relitigation of plaintiff's taking claim. In considering this question, the court has focused on events which have occurred prior to and subsequent to the February 8, 1980, the date of the decision in *Mesa Ranch I, supra.* Relying on undisputed facts gleaned from the submissions of the parties and relevant le-

gal principles, it is concluded that no significant action has been taken by the government with respect to the property in question since the prior dismissal some 28 months previously. Accordingly, it is held that *res judicata* bars relitigation of plaintiff's taking claim at this time. Assuming *arguendo,* that *res judicata* is not for application, in whole or in part, the factual circumstances relied on by plaintiff herein still represent, at best, an "inchoate taking" of plaintiff's property with the taking remaining to be perfected by further official action. *See Mesa Ranch I, supra,* 222 Ct.Cl. at 625, 650 F.2d 285.

*Res judicata* precludes relitigation between the same parties, or their privies, of the same claim which has previously been finally decided on the merits. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *see also Bayshore Resources Co. v. United States,* 2 Cl.Ct. 625 at 635 (1983) (LYDON, J.); *Sterner v. United States,* 2 Cl.Ct. 253 (1983) (WOOD, J.). Plaintiff seeks to avoid application of the doctrine on the ground that the dismissal of its prior taking claim was not a final judgment on the merits. A simple reading of the order in *Mesa Ranch I* shows that the court's previous dismissal did, in fact, constitute a judgment on the merits of plaintiff's taking claim. While the Court of Claims stated "that future events, or non-events, too late to be sued on here, might ripen into a taking * * *," it nevertheless conclusively decided that plaintiff failed to state a taking claim as to the facts and events plaintiff alleged at that time.[4]

---

**4.** It is noted that the Court of Claims in *Mesa Ranch I* did not expressly state that its decision was "without prejudice." Therefore, the decision can reasonably be viewed as a final adjudication upon the merits, *i.e.* "with prejudice." *See* Rule 41(b) RUSCC. When the court intended a decision to be "without prejudice," the Court of Claims so stated. *See e.g., Crosby v. United States,* 230 Ct.Cl. —— (order Feb. 19, 1982); *Santa Fe Engineers, Inc. v. United States,* 230 Ct.Cl. —— (order June 4, 1982), *cert. denied,* 459 U.S. ——, 103 S.Ct. 569, 74 L.Ed.2d 932 (1982). *Hilkovsky v. United States,* 205 Ct.Cl. 460, 467, 504 F.2d 1112 (1974). In *Hilkovsky* the Court of Claims dismissed certain

taking cases "without prejudice to present or future condemnation or taking actions involving any or all of the same tracts of land, alleging dates of taking *subsequent to* December 3, 1971. [The date the dismissed petitions in those cases were filed with the court.]" (Emphasis added.) *Hilkovsky v. United States, supra,* 205 Ct.Cl. at 467, 504 F.2d 1112. The decision in *Hilkovsky,* therefore, dismissed "with prejudice" the merits of the claims before it, while stating that future taking actions, based on events occurring subject to the dismissal, may be presented. This is precisely the posture of the case at bar which involves the question of whether the subject events are of a

The parties discuss the following events as bearing on the question before the court of whether plaintiff's claim is barred by *res judicata,* and if not, whether plaintiff has shown that a taking has occurred: (1) the adoption of the "Land Acquisition Plan"; (2) a series of unsuccessful negotiations for sale of the property; (3) plaintiff's inability to obtain financing on the property; and (4) government acquisition of other land which allegedly deprived plaintiff of the "best access" to a county road from its property.

First, the Land Acquisition Plan, on which plaintiff relies, merely indicates defendant's continued interest in acquiring plaintiff's property for fair market value when funds become available. The plan, thus, conveys the same message to plaintiff that the letter of May 18, 1979, conveyed; that is, that the government intended to acquire the tract at some undetermined future date when funds are available. As indicated in *Mesa Ranch I, supra,* defendant's interest in plaintiff's property is not a taking. *See Mesa Ranch I, supra,* 222 Ct.Cl. at 625–26, 650 F.2d 285. This precise action by the government was considered as part of plaintiff's prior taking claim and, therefore, cannot be viewed as a significant new event warranting special consideration here. Significantly, the plan does not prescribe a time for acquisition. In addition, the land acquisition plan does not specifically list plaintiff's property in the high priority category of "current areas to be acquired." Although the plan states that landowners who develop their property in a way that may be incompatible with Park purposes (*i.e.,* subdivision development) will cause the government "to seek to acquire the property through eminent domain proceedings," the plan also states that condemnation proceedings are regarded as a last resort. A threat of condemnation by defendant is not

a taking even though it tends to thwart a proposed development. *See Mesa Ranch I, supra,* 222 Ct.Cl. at 626, 650 F.2d 285; *NBH Land Co. v. United States,* 217 Ct.Cl. 41, 44, 576 F.2d 317, 319 (1978).

Moreover, relative to development of lands within the pale of the Land Acquisition Plan, the NPS had stated: "[T]he National Park Service cannot deny or restrict a property owner from exercising his right of ownership, including development otherwise permitted by State and local zoning authorities." The statement was in response to the granting of development permits to two landowners, similarly situated as to plaintiff, by the California Coastal Commission. While the Land Acquisition Plan clearly indicates the government's previously announced interest in acquiring the property at sometime in the future, it does not preclude plaintiff from developing its property in conformance with state and local laws. Certainly the Plan does not deprive plaintiff of all viable uses of its property, such as agricultural, which would not be considered an "incompatible use" under the Plan. Plaintiff presently uses, and has for some years used, the land in issue for the grazing of livestock and receives rental income from tenants who use said land, which activity, according to plaintiff, is not the most profitable or highest and best use of the property. Even if the Plan could be said to preclude residential development, frustration of the most profitable or highest and best use by the government is not sufficient to show a taking. *Laney v. United States,* 228 Ct.Cl. 519, 661 F.2d 145, 147 (1981); *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210, 1213 (1981) *cert. denied* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982); *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184, 1193 (1981), *cert. denied* 455 U.S. 1017,

significant nature so as to escape the application of *res judicata,* or constitute, in and of themselves, a taking of plaintiff's property. Plaintiff's sole response to defendant's *res judicata* defense is that this doctrine is not applicable because the decision in *Mesa Ranch I* was not a final judgment on the merits. Plaintiff misreads, in its reliance on the *Hilkovsky* case,

the thrust and import of that decision. The question now is whether future events, those that occurred after the date of *Mesa Ranch I,* were sufficient to constitute a taking. If those subsequent events are insufficient to constitute a taking and the situation basically remains as it was when *Mesa Ranch I* was decided, then that decision would be *res judicata.*

102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). Mere diminution in value, rather than complete destruction of all economically viable uses, cannot establish a taking. *Penn. Central Transp. Co. v. New York City,* 438 U.S. 104, 131, 98 S.Ct. 2646, 2662, 57 L.Ed.2d 631 (1978).

Second, the fact that there were unsuccessful negotiations between the parties concerning the sale of Mesa Ranch is not a significant alteration, or addition, to the facts alleged previously before the Court of Claims. In effect, the parties could not agree on a price: the government solicited an offer for $735,000, based on its own appraisal of the property, while plaintiff offered to sell the property for $1,050,000. Such unsuccessful negotiations add nothing to the situation existing at the time of plaintiff's prior taking claim, nor do they support a present taking claim. Plaintiff alleges that the government negotiated in bad faith because it did not have purchase money available. It is unclear how such a bad faith allegation can help plaintiff's taking claim. Nevertheless, the facts show no sign of bad faith dealings. In August 1980, the defendant informed plaintiff that it was presently experiencing funding problems and that acceptance of an offer to sell would be dependent upon the availability of funds. Availability of funds was a matter mentioned in *Mesa Ranch I, supra,* 222 Ct.Cl. at 625, 650 F.2d 285. According to the Chief of Land Resources Division of DOI, sufficient funds could have been obtained from other appropriated funds if the offer from plaintiff was acceptable to the government. Thus, in good faith the defendant advised plaintiff of its possible funding difficulties, difficulties which apparently could be overcome if the price was right.

Similarly, other negotiations between the parties which terminated without an agreement add nothing of significance to plaintiff's taking claim. Plaintiff's October 3, 1980, offer to sell for $1,050,000 was rejected by defendant. Pursuant to plaintiff's May 21, 1981 request concerning the feasibility of exchanging federally-owned properties for Mesa Ranch, the defendant provided plaintiff with notices and descriptions of 3 available properties for potential exchange. Plaintiff terminated these negotiations by failing to respond after receiving such materials. On March 25, 1982, in response to plaintiff's inquiries concerning government acquisition of its property, Davidge of DOI explained that there were no funds presently available for the purchase of Mesa Ranch and that he did not see any possibility of funding being available in that fiscal year. The remaining meetings between the parties on March 1, 1982 and in April 1982 regarding the sale of Mesa Ranch likewise terminated without an agreement and also fail to show any significant action which would rise to the level of a taking. Until Mesa Ranch title is acquired by the government, it remains with plaintiff. Plaintiff to this date retains title to the property. *See Mesa Ranch I, supra,* 222 Ct.Cl. 625, 650 F.2d 285.

Third, plaintiff points to its inability to obtain financing, in an effort to show that the government's interest in acquiring Mesa Ranch has rendered the property "unmarketable" and "valueless" as a security. Plaintiff's unmarketable allegation was also made in *Mesa Ranch I, supra,* 222 Ct.Cl. at 625, 650 F.2d 285 and found unpersuasive. It is equally unimpressive here. Plaintiff relies on several letters and affidavits supplied by financial institutions. The materials from several financial institutions suggest that the government's inclusion of Mesa Ranch within the national park map was neither the sole nor the crucial factor in their decision refusing financing to plaintiff. In fact, it appears that plaintiff's admitted financial instability, speculative repayment sources, and failure to obtain the necessary state and local regulatory approvals for development were important factors considered when denying plaintiff's loan requests. It is true that some loan denial letters received by plaintiff stated that the uncertain government purchase, due to lack of appropriated funds, hurt plaintiff's chances to get a loan. This would seem to indicate that plaintiff's repayment sources were insufficient and that

plaintiff relied on the uncertain government purchase to show that it would be able to repay the loan. Finally, plaintiff's bald assertion that its property has been rendered "valueless" by government actions is patently without merit. There is no allegation by plaintiff that potential agricultural use of the property is worthless. Further, the government's offer to purchase said lands for $735,000, along with plaintiff's own appraisal of the property of $1,050,000 indicate that the land has value.

In essence, plaintiff's argument based on its inability to obtain a loan flows from the announced interest of the NPS in the property. As indicated previously, announced interest in a property, or even the threat of condemnation of said property, does not provide a basis for finding that a taking has occurred. *See Mesa Ranch I, supra,* 222 Ct.Cl. at 626, 650 F.2d 285; *see also United States v. Sponenbarger,* 308 U.S. 256, 267–68, 60 S.Ct. 225, 229–30, 84 L.Ed. 230 (1939); *Bauman v. Ross,* 167 U.S. 548, 596–97, 17 S.Ct. 966, 984, 42 L.Ed. 270 (1897); *Hempstead Warehouse Corp. v. United States,* 120 Ct.Cl. 291, 306, 98 F.Supp. 572, 573 (1951).

Fourth and finally, plaintiff asserts that the government, by purchasing certain property (known as the "RCA" property) adjacent to Mesa Ranch, has deprived plaintiff of the "best access to a county-maintained road." Access to a county-maintained road is required under Marin County subdivision law. Plaintiff seeks to take advantage of the holding in *Drakes Bay Land Co. v. United States, supra,* 191 Ct.Cl. at 389, 414, 424 F.2d at 574, by claiming that where an owner is deprived of the intended use of his property because the government acquired lands surrounding his property, which prevent the "best access" to a county road, a taking has occurred. The question of access was not discussed in *Mesa Ranch I, supra.* The present record does not indicate when the government acquired the RCA property so there is no way of determining whether this argument was one that could have been, and should have been raised in *Mesa Ranch I. See Container Transport Int'l, Inc. v. United States,* 199 Ct.Cl. 713, 717–18, 468 F.2d 926, 928 (1972). Accordingly, *res judicata* may not be applicable to this issue. However, analysis of undisputed facts before the court and applicable case law establish that, in any event, no taking has yet occurred.

In *Drakes Bay,* the Marin County Board of Supervisors advised the plaintiff-developer that there was only one route over which a county standard access road could be constructed to allow plaintiff to subdivide his land according to the county subdivision laws. Thereafter the Board of Supervisors laid the groundwork for the construction and financing of the county road which would provide plaintiff its only feasible access. Subsequently, however, the government acquired the property on which the only possible access route could be constructed thereby preventing plaintiff's intended development. *Drakes Bay Land Co. v. United States, supra,* 191 Ct.Cl. at 399–404, 424 F.2d at 579–82. In *Hilkovsky v. United States, supra,* the Court of Claims pointed out that "blockage of public road access by defendant was a key factor in determining taking by the United States." 205 Ct.Cl. at 466, 504 F.2d 1112. In this case, as in *Hilkovsky,* there is and was road access to plaintiff's property. The fact that other access routes are available to plaintiff precludes any finding that a taking occurred here. *See Miller v. United States,* 223 Ct.Cl. 352, 392–93, 620 F.2d 812, 833 (1980). *See also United States v. Certain Land in the City of Newark,* 314 F.Supp. 836 (D.N.J.1970), *aff'd* 439 F.2d 670, 673 (3d Cir.1971); *Ralph v. Hazen,* 93 F.2d 68, 71 (D.C.Cir.1937); *United States v. Alderson,* 53 F.Supp. 528, 530 (S.D.W.Va.1944).

The instant case is quite distinguishable from *Drakes Bay.* Here, there has been no decision by the Board of Supervisors, nor any allegation, by plaintiff, that there is only *one* feasible access route from plaintiff's property. Indeed, plaintiff's complaint is that defendant has blocked plaintiff's "*best access* to a county maintained road." (Emphasis added.) Plaintiff does not allege that defendant has blocked all

access to and from its property.[5] Loss of the most desirable access route certainly does not completely preclude development, as in *Drakes Bay,* and thus does not constitute a taking. *See Miller v. United States, supra,* and like cases cited above.

As discussed above, the events or actions, which occurred both before and after the dismissal of plaintiff's prior claim, have not impermissibly restricted plaintiff's development of its property. On the contrary, plaintiff remains free to develop its property now as it did prior to *Mesa Ranch I, supra.* In fact, plaintiff's own inactions provide the best explanation for the lack of development of its property thus far.

On April 1, 1981, the California Coastal Commission (Commission) certified a Marin County zoning plan that zoned Mesa Ranch for residential use (1 unit per 20 acres), which was subsequently adopted by Marin County as part of its zoning district map.[6] However, in February 1982, the Commission denied Marin County's proposal to amend the Marin County Local Coastal Plan to permit the development of certain building sites on Mesa Ranch. The Commission ruled that there were questions concerning whether the amendment proposal conformed with various provisions of the California Coastal Act. The Commission ad-

vised plaintiff, by letter, of the remedial steps which it should take in order to get further consideration of the proposed amendment by the Commission. Yet, the materials presently before the court indicate that no further action has been taken by either plaintiff or Marin County with respect to the proposed amendment. Although plaintiff argues that only Marin County had the authority to apply for an amendment to the Coastal Commission, this technicality provides little excuse for plaintiff's inaction. Plaintiff's obvious stake in the proposed amendment and its stipulated judgment entered with the county regarding subdivision development, demonstrate that plaintiff not only had a substantial interest in approval of the amendment, but had agreed, per stipulated judgment, to work in concert with the county in seeking the Commission's approval of the amendment to the Local Coastal Plan. Therefore, it would be completely reasonable under these circumstances to expect that plaintiff would have, at a minimum, corresponded with the county urging it to take the necessary remedial steps as outlined in the Commission's letter to plaintiff. Plaintiff offers no evidence of any such correspondence or communication.

Thereafter in March 1982, plaintiff filed with Marin County its master plan, develop-

---

**5.** Despite plaintiff's assertions to the contrary, there is no genuine issue of material fact concerning access to plaintiff's property. Not only has plaintiff failed to allege that the government blocked its *only* access, but the submissions of the parties indicate that there is reasonable access to the property available via Poplar Road. *See* note 3, *supra.* The materials before the court also suggest that Poplar Road is the current access route used by plaintiff. Further, a tentative subdivision map of the Mesa Ranch development, supplied by defendant, indicates that plaintiff intended to use Poplar Road as its access to and from the proposed subdivision development. Poplar Road ran along the entire southern boundary of the plaintiff's property. Plaintiff's own appraisal of its property, performed by A.G. Holter & Co. on September 18, 1980, lists as supportive of the property's worth, the fact that Mesa Ranch has "road access" along entire southern boundary.

**6.** About this same time, the California Coastal Commission approved two applications for coastal development permits for residential

construction. Both applicants, like plaintiff, owned property located in the park area which was also slated for acquisition by the Park Service at some future undetermined date. Plaintiff downplays this fact by asserting that these were single dwelling undertakings, and not developmental efforts. However, the fact remains that the owners of these lands were included within NPS's Land Acquisition Plan and covered by NPS's announced interest in *said lands.* Despite the *specter* of the threat of condemnation these landowners nonetheless proceeded with plans to improve their properties thereby indicating that there was not, as yet, a taking of their lands. In the words of the decision in *Mesa Ranch I, supra,* there was at best, "an inchoate 'taking' of lands shown by a map to have been selected, with the taking remaining to be perfected by further official action" (222 Ct.Cl. at 625, 650 F.2d 285). As of this date no "further official action" has been taken relative to plaintiff's property.

ment plan, tentative map and coastal permit application. In response, Marin County requested that plaintiff supply substantial amounts of additional information in order for the application to be deemed complete and ready for consideration.[7] The county advised plaintiff that if the additional information was not received by May 22, 1982, the application would be deemed withdrawn and that plaintiff had a right to appeal the decision as to the application's insufficiency by April 29, 1982. Plaintiff neither filed a timely appeal of the decision nor submitted the requested information by May 22, 1982. Instead, plaintiff requested seven time extensions, which have been granted by the county. Plaintiff's complaint that the costs of supplying the information are prohibitive is in no way supportive of its taking claim. In fact, this argument provides the explanation that the failure to take the appropriate steps to develop the property is attributable to plaintiff itself, rather than the federal government. Furthermore, to the extent that plaintiff's development plans may have been inhibited by state and county action, such action is clearly not imputable to the United States. *Mesa Ranch Partnership v. United States, supra,* 222 Ct.Cl. at 626, 650 F.2d 285; *De-Tom Enterprises, Inc. v. United States,* 213 Ct.Cl. 362, 552 F.2d 337 (1977).

### III.

The undisputed facts in this case establish that no significant events, supportive of plaintiff's taking claim, have occurred since the prior dismissal of this same taking claim in *Mesa Ranch I, supra.* Such a situation supports application of the doctrine of *res judicata,* in whole or in part, to the facts of this case. On the other hand, even if one were *arguendo,* to disregard the application of *res judicata,* after due consideration of the alleged facts, both before and after *Mesa Ranch I, supra,* it is concluded that plaintiff has failed to allege facts which establish that its property has been taken. In this consideration, the holding in *Mesa*

*Ranch I, supra,* as a matter of *stare decisis,* has precedential value. As of this date, there has been no taking of plaintiff's property. *See Mesa Ranch I, supra,* 222 Ct.Cl. at 626, 650 F.2d 285. Accordingly, defendant's motion for summary judgment is granted, with plaintiff's complaint to be dismissed.

---

**7.** Plaintiff's civil engineering firm estimated the total cost for supplying the additional request- ed information at $118,000.