L. ALTHAUS, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 443–82L, 352–83L.

United States Claims Court.

April 4, 1985.

---

William W. Essling, St. Paul, Minn., for plaintiffs; David Essling, Dennis D. Daly, Jr., St. Paul, Minn., and Michael J. Michalski, Windom, Minn., of counsel.

George R. Hyde, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., and Albert V. Witham, Denver, Colo., for defendant.

## OPINION

MAYER, Judge.

This case of consolidated complaints originally involving 26 tracts of land and multiple owners as plaintiffs claims the government has taken private property in violation of the United States Constitution. The question of liability was tried over two weeks in International Falls and Duluth,

Minnesota. In the course of the proceedings, complaints involving 13 tracts were settled by compromise, leaving 13 for decision now. Five of the tracts contain improvements; eight are unimproved.

## Facts

In January of 1971, Congress passed Pub.L. No. 91–661, 84 Stat.1970, authorizing the establishment of Voyageurs National Park in northern Minnesota adjacent to Canada, contingent upon the State of Minnesota and its political subdivisions donating their lands within the park area described in the legislation. *See* 16 U.S.C. § 160a. Thereafter, Minnesota enacted a Voyageurs National Park Act, and by 1975 had donated all state and local government lands within the designated park boundaries, approximately 35,000 acres, to the United States.

On April 8, 1975, Voyageurs National Park was formally established in accordance with Pub.L. No. 91–661. Within a year, the legal description of the included lands was completed. The Act provided that the park would include all of the land and water within the boundaries, which included all of the land of the plaintiffs in this case. Plaintiffs' land was designated as private and was authorized to be acquired by purchase, donation, or exchange. After 1975, and continuing to the present time, the United States Department of Interior has acquired fee title to more than 95 percent of the land within the park boundaries by declarations of taking, condemnation proceedings, purchase, or exchange. Appropriations of over $44,000,000 and expenditures for land acquisition in excess of $39,000,000 have occurred to date.

Plaintiffs here acquired their land before the establishment of the park in 1975. Indeed, all of it except tract 70–157 was acquired before enactment of either the federal or state Voyageurs Park acts. Some of it was developed; summer cabins or houses were built on it. The rest was undeveloped and held for investment or with the intention to subdivide, sell, develop, or bequeath.

Access to these properties, and to the interior of the park generally, is available by pontoon equipped airplane and boat, and by sled, ski, snowshoe, snowmobile and dogsled in the wintertime. The park is open and available to tourists and recreational users all year round.

The National Park Service has mapped the lands within the boundaries of the park for acquisition purposes. The maps are designated as "land acquisition segment maps" and identify 1,500 separate tracts. Of these, approximately 848 were private lands and the balance were public or corporate lands. Approximately 92 of the private tracts were leaseholds granted by the State of Minnesota, all of which will expire by July of 1985. The public lands were transferred to the United States before the park was established on April 8, 1975. As of September 6, 1983, it appears that 124 privately owned tracts within the park, totaling approximately 3,383.68 acres, remained to be acquired by the National Park Service out of a total of approximately 133,640 acres included within its boundaries. The property of the remaining plaintiffs in these cases is classified by the Department of Interior's Land Acquisition Plan of September 6, 1983, as "property needed for the park," and consists of 13 tracts totaling approximately 455.6 lake shore acres.

After 1976, the government published in its official records requests for initiation of eminent domain procedures against plaintiffs' tracts within the park. In addition, the government specifically described and identified property of each of the plaintiffs in the land acquisition book of maps and plats as lands to be acquired by the United States. It identified the owners by name and tract number and showed the number of acres contained in each tract. It further identified the nature of the plaintiffs' ownership of the properties and how they acquired the land in the first place. The government has employed contract appraisers to examine, appraise, and report on each of these tracts.

Over the years, condemnation suits were brought in the United States District Court in Minnesota. The awards to land owners in those cases actually tried exceeded the government's appraisals and offers to purchase by from 271 percent to 1,403 percent, the average excess of award over appraisal and offer being 785 percent. Thereafter, all of the outstanding condemnation suits, except for these inverse condemnation cases and two or three anticipated declarations of taking, were settled.

The government has secured professional appraisal reports about the fair market value of plaintiffs' properties and improvements if there are any. It has collected and filed comparable sales information and ascribed particular elements of it to each of the plaintiffs' properties. This has received wide public attention. The government has secured title insurance policies on each of the plaintiffs' tracts in which it is designated as the insured.

The government has secured ownership of all of the land that adjoins or abuts each of the plaintiffs' tracts, and has sent them letters stating the amount of money it deems the fair market value of their properties. Since the Voyageurs National Park and the nearby Boundary Waters Canoe Area were established, the supply of private lake shore, river front or water adjacent lands has significantly decreased. There is a definite, though specialized, demand for lake shore and forest land for recreational use and development in the area, and the land is amenable to subdivision into lot size parcels, and platted subdivisions, both large and small.

The federal presence in the area has increased since 1975 and is manifested by releases to newspapers, television and radio, and by direct mail to the public, covering a wide variety of potential or actual control and regulatory matters. The government publicized such things as proposals to limit, restrict and regulate the use of and access to the parklands. Many public meetings attended by federal officials or sponsored and conducted by the government about federal control and management of the park area, and the solicitation of public comment about proposed federal regulation and control of the park have occurred. Participation by the public, either as individuals or as representatives of groups such as trade and environmental organizations, was heavy. Throughout, the government has proclaimed orally and in writing, and continues to do so, its unqualified and unconditional intention to acquire all private lands within the park.

Between 1977 and 1979, the Park Service initiated formal requests to begin condemnation proceedings against each of our plaintiffs' tracts. Concurrently, it made formal offers to purchase each of the tracts, which it sought to compel plaintiffs to accept. The statutory declaration of taking procedure, 40 U.S.C. § 258a, has been used as an instrument of policy by the Park Service. It either has been actually employed or its availability has been extensively advertised as a response if private landowners use their land in a manner deemed inconsistent with Park Service officials' perceptions of park compatible uses.

In August of 1977, Kenneth White, Chief Land Acquisition Officer for the park, accompanied by other Park Service officials, attended a meeting with landowners at what was known as Shenklin's Lodge. Among the 50 to 100 people present were some of the plaintiffs in this case. In the course of that meeting, White said to the assemblage, in these words, or words to the same effect,

I am in charge of acquiring lands for the National Park Service. Even though we know what your lands are worth, we are going to try and get them for 30 cents on every dollar that we feel they are worth. Of course, you don't have to accept this 30 cents on the dollar. We will let you wait for a couple of years. If you don't take 30 cents on the dollar right now, you wait for a couple of years. After a couple of years if you won't take 30 cents on the dollar, we are going to condemn it. We will condemn your property. You know what that is going to mean? That means that you are going

to have to hire an expensive lawyer from the city and he is going to take one-third of what you get. Plus, you know who is going to have to pay the court costs. You are. That is in addition to these expensive lawyers.

The essence of these remarks was testified to by a number of the plaintiffs all of whom the court concludes were credible. Although plaintiffs were variously emotional, sad, angry or resigned, no reason to doubt their credibility was shown or is apparent. Other testimony suggests this was not the only occasion White imparted this message to landowners.

Defendant's response to this evidence consisted of testimony by Park Service officials present at the meeting, who carefully said that they either did not hear White make the statement or did not recall hearing him make the statement. A former superintendent of the park said he never heard any complaints about his staff attempting to acquire property for 30 cents on the dollar of its fair market value. Defendant also relied on a newspaper report of the meeting which contained no reference to this statement.

Significantly, however, defendant presented no direct contradiction or explanation of these remarks. The logical witness to either contest or explain the statement is White. He was not a primary witness, called as a rebuttal witness, or subpoenaed to appear. The only information presented about him was the testimony of one Park Service official present at the Shenklin's Lodge meeting who said that he attempted to call White on the telephone just before trial to confirm his own recollection of the events at the meeting. He did not succeed because White has no telephone. From this, the court can conclude that if he is no longer employed by the Park Service and subject to their control, White is alive and his whereabouts are known. Logically, one would expect that he either appear or some explanation about his failure to appear would be presented. In the absence of this, the court infers that his testimony would not be helpful to defendant. *See, e.g., Case v. New York Central Railroad Co.,* 329 F.2d 936, 937 (2d Cir.1964); *Peterson-Sharpe Engineering Corp. v. United States,* 6 Cl.Ct. 288, 296 (1984).

That the newspaper article contained no reference to White's statement is entitled to little weight. The reporter did not testify, so it is not known if she was present at the time White made the statement or if, perhaps, the statement was included but stricken in the editorial process.

Therefore the court finds that White did make a statement substantially to the effect set out above and that a reasonable interpretation of it was that he sought to compel the landowners to sell the government their lands for 30 percent of their fair market value. It is also instructive that after vigorous negotiation White offered plaintiffs Hughes $44,000, subsequently raised to $50,000, for their property. An approved government appraisal report valued the property at $126,000.

Among the government documents most important to this case is the approved land acquisition plan of October 3, 1980, the introduction of which contains an acquisition inventory of 1,500 public and private tracts. It says, "Of the private ownership tracts, 713 have been acquired leaving 199 tracts to be obtained." It contains 13 references to control of private land if the owners attempt to use or develop the property and which are regarded as incompatible with or adverse to the plan. It says that where a private owner undertakes a use or activity inconsistent with the plan, eminent domain or a declaration of taking will be initiated against the property. It also provides that if a purchase cannot be negotiated, the Park Service would rely on local zoning if possible to control private land uses within the park.

The Wilderness Act of 1964, 16 U.S.C. §§ 1131–36, was applied to the Boundary Waters Canoe Area by the Boundary Waters Canoe Area Wilderness Act of 1978, Pub.L. No. 95–495, 92 Stat. 1649. The Boundary Waters Canoe Area was carved out of the Superior National Forest adja-

cent to Voyageurs National Park. Thereafter, a proposal to impose the Wilderness Act requirements on Voyageurs came under consideration by the government and was widely and publicly discussed. News releases were distributed, public meetings were held, and papers, reports and documents were sent out. The wilderness suitability plan contained maps, diagrams and statistics suggesting seven alternatives which could result in up to 96.8 percent of the park recommended for wilderness status. It was distributed by mail to over 1,000 recipients. All of the land adjoining that of plaintiffs was proposed for wilderness status and all of theirs, except for tract 54–114, was classified as "wilderness" or "potential wilderness." The result of a wilderness designation is that the area would be entirely undeveloped and preserved as primitive and primeval. Humans would be either excluded or sharply limited in their method of travel, living and working in the designated area and would be permitted to visit it only temporarily. *See generally, Minnesota v. Block,* 660 F.2d 1240 (8th Cir.1981).

### Discussion

This case is premised on the vital clause of the fifth amendment of the Constitution that "private property [shall not] be taken for public use, without just compensation." Typical of many inverse condemnation cases, it raises the question of whether there has indeed been a taking of private property for the public benefit.

 Plaintiffs do not allege a discrete, dispositive act of the government, which would make it relatively clear if a taking has occurred. They do not say there has been a physical seizure or invasion of their property, access has been denied, legislation has divested them of title, or the government has changed the use of their property by direct regulation. Their claim is based instead on a progressive accumulation of events and governmental actions that resulted in a de facto exercise of the power of eminent domain consequent to the congressional creation of the park. In these circumstances whether or not a constitutional taking has occurred requires an ad hoc determination on the basis of the peculiar facts of the case. Restraint of rights inherent in private ownership of property is not prohibited even if it results in some diminution in value or some restrictions on uses or disposition. But this court is guided by Justice Holmes' caution "that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 416, 43 S.Ct. 158, 67 L.Ed.2d 322 (1922).

 The concept of property in the fifth amendment includes the entire bundle of rights inherent in ownership, among them the right to possess, use and dispose of it. *United States v. General Motors Corp.,* 323 U.S. 373, 377, 65 S.Ct. 357, 89 L.Ed. 311 (1945). "Taking," in a case like this, means the destruction or deprivation of substantial property rights. It is essentially a "question of degree—and therefore cannot be disposed of by general propositions." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. at 416, 43 S.Ct. at 160. There is no set formula to decide if a taking has occurred; it always depends upon the particular circumstances. *Hodel v. Virginia Surface Mining & Reclamation Ass'n.,* 452 U.S. 264, 295, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); *Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 125, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). It is quintessentially a question of fact. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 889 (Fed.Cir.1983).

 The enactment of legislation may be the beginning of a taking but it is not normally a taking in and of itself. *Danforth v. United States,* 308 U.S. 271, 286, 60 S.Ct. 231, 84 L.Ed. 240 (1939). Similarly, delay in fully implementing a statute authorizing the acquisition of property for the public good is not enough, standing alone, to be a taking. *Hilkovsky v. United States,* 504 F.2d 1112, 1115, 205 Ct.Cl. 460 (1974). And mere diminution in value is not a taking. *Deltona Corp. v. United*

*States,* 657 F.2d 1184, 1191, 228 Ct.Cl. 476 (1981). Plaintiffs do not say otherwise.

What plaintiffs do say is that beginning with the establishment of the park in 1975 pursuant to 16 U.S.C. § 160a, defendant embarked on a course of conduct, the logical, inevitable, and foreseeable, if not intentional, consequence of which was to deprive them of any market for their property and the right to use it other than as the general public could use the surrounding parkland. The government forced them in effect to hold their lands in trust for the general public and frustrated any commonly accepted use for private property. It froze them in place indefinitely until it could get around to paying discounted prices for their property. Although plaintiffs claim the government's actions resulted in a taking of all the lands in suit, the court will address them according to their state of development.

*Undeveloped Property*

Relying primarily on *Drakes Bay Land Co. v. United States,* 424 F.2d 574, 191 Ct.Cl. 389 (1970), where a taking was found, plaintiffs say that serving the public interest by returning land to a wilderness state, *see* 16 U.S.C. § 160, should not be done at their unrelieved expense. Their reliance on *Drakes Bay* is well taken.

In that case, plaintiff brought an inverse condemnation suit claiming that actions of the government resulted in a taking of his land within Point Reyes National Seashore park. He satisfied the Court of Claims that he bought the land before the park was established intending to subdivide and sell it in small lots. He met with Park Service officials who assured him of their desire to exchange other federal land for his as permitted by the enabling legislation. Relying on this, he withdrew a subdivision proposal from the local planning commission, and applied unsuccessfully for other federal lands to exchange. During this time, there was extensive and pervasive publicity covering the establishment of the park. Over 700 news items appeared in the regional newspapers over three years. Some newspapers printed articles saying it might be fraudulent to sell parcels in plaintiff's subdivision because of the pending Seashore bill, but the Park Service declined to correct this misinformation.

The Park Service effectively barred construction of an access road to plaintiff's land by threatening to record a quitclaim deed to the only strip of land over which a road could be built. This would have prevented the local assessment district from condemning it for that purpose. The deed was never recorded, but the threat was sufficient to halt all activities of the assessment district.

After acquiring most of the private lands within the boundaries of the Seashore park, the Park Service was no longer interested in purchasing plaintiff's property in accordance with earlier negotiations. It refused either to accept his offers to exchange his land for other federal lands, or to buy it. All of this conflicted with the Point Reyes National Seashore Act requirement for a reasonably prompt and equitable acquisition program.

The Court of Claims readily found that the accumulation of these events and governmental actions deprived plaintiff of his property. Our case is remarkably similar; if anything, it is stronger than that one. With *Drakes Bay* as a template, the nearly parallel facts lead to the same conclusion.

Plaintiffs here owned their property before the park was authorized and established. They variously held their undeveloped property for construction of a cabin in the case of the Averys; to subdivide and sell in the case of the Bakers, Hedderich, Hughes, the Leachs, and the Liemandts; and for recreational development in the case of the Liemandts and perhaps Sells. Some plaintiffs testified they intended to use the land for supplemental retirement income; others planned to build additional cabins for their children as they grew up and had families; still others viewed the land as an investment to pass on to their descendents. Once it was clear their property was destined for the park, however, plaintiffs negotiated or attempted to negotiate its sale to the government.

There was extensive publicity about the establishment and development of Voyageurs National Park. The wide dissemination of plans, proposals, and suggestions the court cited earlier were even more pervasive than was remarked upon in *Drakes Bay*.

Although there was no bar, actual or constructive, to access to plaintiffs' properties as there was in *Drakes Bay*, an event of substantively equivalent impact occurred as a result of Kenneth White's activities. In the court's view, White's role was significant among the events resulting in a taking. No prudent person would be interested in purchasing plaintiffs' properties under the threat of government action to compel its sale ultimately at less than a third of its fair market value. The alternative he posed, protracted litigation and the accompanying inconvenience and expense, made the property no more attractive.

Defendant says the property was not totally without a market. The evidence shows that in the seven and one-half years preceding trial only five private transactions occurred inside the park in St. Louis County. Seven of the ten county townships covered by the park experienced no private sales in that period. The other three townships lay partly in and partly outside the park. All but the five of 104 private transactions occurred in the area outside the park boundary. Now, according to the testimony, there is no activity in the market. Defendant's suggestion that there is a market because land speculators would buy the properties at 25 to 50 percent of their value is unavailing for two reasons. First, no evidence of any such transactions, attempted or consummated, was presented. Second, the court rejects the idea that the fifth amendment can be avoided by forcing citizens to sell their property to speculators at a fraction of its value.

In addition to the explicit intention of the government to acquire all of the property within the park, which in and of itself is not remarkable, recurrent public musings about restrictions that might be placed on the park had a significant dampening effect on whatever market might be thought to have existed for plaintiffs' properties. For example, speculation about prohibiting use of motor boats and airplanes for travel within the park, except in emergencies, was given credence by the imposition of precisely those prohibitions in the adjacent Boundary Waters Canoe Area. This would, of course, severely restrict travel to plaintiffs' properties. The fact that Boundary Waters is a national forest administered by the Forest Service of the Department of Agriculture, rather than the Park Service of the Department of Interior, would be lost on all but the most astute observers. That those two departments administer their holdings under separate statutory and administrative provisions, and for different purposes, is not a distinction likely to be appreciated by the general public. In any event, it does not bar the Park Service from imposing similar restrictions.

■ The Park Service has acquired more than 95 percent of the land within the park boundary and each of our plaintiffs' holdings is now an oasis surrounded by public property. This was vividly shown to the court at trial during an extensive view by airplane conducted after a joint request by the parties. At least since the final land acquisition plan of October 3, 1980, was issued, the event the court views as the consummation and date of the taking, plaintiffs were frozen in place. The significance of this plan is that it draws together and, in effect, ratifies what had occurred to that date in the development of the park, and projects no change, or expectation for change, in the future. It memorializes the status of plaintiffs' properties in a public document and confirms the restrictions on their use and the likely response if the restrictions were transgressed. Issuance of the document was the climactic event in the progressive taking of the properties in this case. Whatever the debate over the actionability of events and acts, individually or cumulatively, before October 3, 1980, the court finds any taking was complete by then. *See United States v. Dickinson*, 331

U.S. 745, 749, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947); *Barnes v. United States*, 538 F.2d 865, 873, 210 Ct.Cl. 467 (1976); *Castro v. United States*, 500 F.2d 436, 440, 205 Ct.Cl. 534 (1974).* Thereafter, as in *Drakes Bay*, they could be dealt with by the government at its pleasure. It retained an arsenal of weapons to deter any attempt to use the property other than as if it were parkland.

Defendant showed at trial that it rarely resorted to declarations of taking and that Congress has not approved many of those it sought. That is small comfort to a private party who cannot know in advance that the government will not exercise the statutory authority it has threatened, or that if it does Congress will not approve. "It is one thing to have the sword of condemnation resting available but unpointed in the government sheath. It is another to have it suspended like that of Damocles directly above one's property." *Halpert v. Udall*, 231 F.Supp. 574, 579 (S.D.Fla.1964) (three judge court; Choate, J., concurring). The record shows that in the seven years preceding suit, only fifteen of 2,000 building permits for seasonal cabin or boathouse construction or improvements issued in St. Louis County were applicable to property inside the park. Plaintiffs would be imprudent indeed to invest effort or money in construction, planning, subdivision or any other potentially incompatible activity. The same goes for any putative purchasers.

As in the Point Reyes National Seashore Act at issue in *Drakes Bay*, Congress reflected its appreciation of the fifth amendment by requiring that an equitable acquisition program be used with reasonable promptness at Voyageurs. *See* 16 U.S.C. § 160b. We are now approaching the tenth year of the property acquisition program and these plaintiffs are still on hold. This cannot be what Congress intended. In situations like this where Congress has flatly declared it is going to acquire the land, the only question is when, and executive officials' activities are all directed to that end, a taking can be more readily found. "This is a hybrid situation, not the pure legislative taking …, and not the pure physical invasion of the land apparently unwanted as Government property…." 424 F.2d at 584. Nor is it a taking by direct regulation. But once Congress sets this process in motion, it is "presumptively aware that the activities of its agents implementing its programs can effect takings without recourse to the usual machinery of land acquisition, that is, purchase or condemnation." *Id.* See also *Whitney Benefits, Inc. v. United States*, 752 F.2d 1554, 1559 (Fed.Cir.1985); *NBH Land Co. v. United States*, 576 F.2d 317, 319, 217 Ct.Cl. 41 (1978).

Therefore, the court finds that defendant has for nearly ten years continuously and publicly propounded its intent to acquire plaintiffs' lands. The property will be acquired in the public interest to return it to and preserve it in a natural state, prohibiting the ordinary and essential uses and rights of private ownership. Defendant has the power to take plaintiffs' lands by eminent domain and has long threatened to do so; but it has not acted. The confluence of pervasive and unsettling publicity about the park, the threat of condemnation and the course of government employees' conduct has paralyzed plaintiffs' use of and ability to sell their properties except to the government. They are prevented from any use of the property different from that of the surrounding parkland in the interim except, possibly, to hunt, *c.f. United States v. Brown*, 552 F.2d 817, 821 (8th Cir.1977), although some documents call even this an incompatible use. Employees of defendant on this record manifested their intent to buy the land at significantly less than fair market value. All of this has kept plaintiffs from any commercial use or development of their properties. Similarly, they have been deprived of any private or personal use or development, such as construction of a cabin, cottage or recreational

---

* In light of this, defendant's suggestion that the claims are barred by the six year statute of limitations, 28 U.S.C. § 2501, is without merit.

home, or the subdivision or sale of land in excess of that needed for personal use.** The undeveloped property has been taken by defendant.

*Improved Property*

■ As opposed to the unimproved property just discussed, the land on which some of the plaintiffs have cabins or houses is in a different posture. Concededly, the operative facts and the actions of the government are the same. There is no market for these properties and the Park Service can stop any changes to them if it conceives them incompatible with the park. But in spite of these inhibitions on some of their property rights, plaintiffs can still travel to and use these properties as they always have. The evidence shows that the government will not prohibit repairs and modifications to the structures, although it has review authority by virtue of the continuing condemnation threat. Similarly, the evidence shows the Park Service would not object to such things as digging a new well for drinking water. The unfortunate uncertainty about how long plaintiffs can retain these properties and the inability to dispose of them if they wish is not sufficient to amount to a taking.

It is not unprecedented that the same governmental actions would lead to the perhaps peculiar result that different categories of property would be impacted differently depending on their actual and intended use. *United States v. 15.65 Acres of Land*, 689 F.2d 1329, 1334 (9th Cir.1982), suggests that holdings of improved land under threat of condemnation should be treated differently from holdings of unimproved land. The court there said,

The effect of a condemnation suit on unimproved land held for development is significantly different from its effect on developed property. While a condemnation suit may change the value of improved property somewhat, the owner usually continues to enjoy the beneficial use of his land until a declaration of taking is filed. Intervening fluctuations in value are indistinguishable from the usual burdens of ownership and do not constitute a taking....

On the other hand, when the property condemned is intended for development and sale, and remains unimproved, the owner following a condemnation suit frequently loses more than just value; he may be deprived of all economic use of his land. While the action is pending, the land is almost impossible to sell, although that alone is not sufficient to create a taking.... The owner of unimproved land is thus left with the liabilities which follow title but none of the benefits, save the right ultimately to be paid for the taking. [Citations omitted.]

The Court of Claims said the same thing in *Hilkovsky v. United States*, 504 F.2d 1112, 205 Ct.Cl. 460 (1974), a case about property within the Point Reyes National Seashore, the park in which *Drakes Bay* held a taking of undeveloped property had occurred. In *Hilkovsky*, however, the properties of the plaintiffs were still being used and enjoyed in the same manner as before, unhindered by the government. Plaintiffs' only complaint was the length of time the government was taking to acquire their property, similar to our situation, but the court said that was not enough. *Id.* at 1115. Even the added feature of loss of marketability, not discussed in *Hilkovsky* but proved in our case, would not suffice to establish compensable deprivation. *See Andrus v. Allard*, 444 U.S. 51, 65, 100

---

** Defendant was not unaware of the effects of its past actions. In drafts of later "land protection plans," it observed,

There are no known plans for developing currently undeveloped properties, mainly due to published National Park Service intent to acquire all private lands and prior Service procedure which has been to use a declaration of taking to acquire land upon which development is initiated.

The Park Service director of the region wrote the park superintendent on November 3, 1981,

We can ... control the use of land within our boundaries by setting in motion various procedures to acquire property if the landowner takes action that would be detrimental to the resource. This policy allows us to prohibit further development of a property.

S.Ct. 318, 62 L.Ed.2d 210 (1979); *Halpert v. Udall,* 231 F.Supp. 574 (D.S.Fla.1964) (three judge court); *but see,* 231 F.Supp. at 578 (Choate, J., concurring).

The court concludes plaintiffs are left with a reasonable beneficial use of their property. *Penn Central,* 438 U.S. at 135, 98 S.Ct. at 2665. They can possess and use it; only their ability to dispose of it is circumscribed. *See United States v. General Motors Corp.,* 323 U.S. at 377, 65 S.Ct. at 359. "At least where an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety." *Andrus v. Allard,* 444 U.S. at 65, 100 S.Ct. at 326–327. This may not be a fully satisfactory result but, as opposed to undeveloped land which can in reality only be held inviolate by the private owners until the public pays for it, the developed properties can be and are being enjoyed as before, even if not saleable or capable of further development. That is not to say that changed circumstances and delay more extraordinary than shown here might not call for a different result. *See Agins v. Tiburon,* 447 U.S. 255, 263 n. 9, 100 S.Ct. 2138, 2143 n. 9, 65 L.Ed.2d 106 (1980). But the government insists it will buy all this property as appropriations are received and plaintiffs are freely using it in the meantime.

■ The evidence is imprecise about how much land in addition to that subjacent to their buildings is sufficient for these plaintiffs to continue to make use of their properties. At trial, the present park superintendent spoke of former owners in the park who were permitted to purchase a leasehold of their dwellings and a "habitable zone" around them for a term of years after the government purchased their property. Unfortunately, however, the habitable zone was not defined. Nevertheless, the record shows this to be a concept permitted by the Act, *see* 16 U.S.C. § 160c, and agreeable to both the government and the former landowners who subscribed to it. In the absence of any contrary evidence, application of the concept here is appropriate. The court finds no taking of the developed properties, to be measured by a habitable zone around the dwellings according to established Park Service standards, and including access to the shoreline closest to the structures.

The court is not unmindful that " '[t]aking' jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrograted." *Penn Central,* 438 U.S. at 130, 98 S.Ct. at 2662. But in this case, as the aerial inspection confirmed, the isolated improvements are complete and identifiable and can be measured by a habitable zone around them. The legislation contemplates this practice and the Park Service has implemented it. Improvements cannot be expanded into the remainder of the tracts upon which they sit. These remainders have suffered the same fate as parcels on which no development has yet occurred and it would exhalt form over substance to deny compensation for their taking.

**Conclusion**

The unimproved properties of these plaintiffs were taken by defendant on October 3, 1980, without payment of just compensation. The improved properties, as measured by the habitable zone around the improvements, have not been taken. Further proceedings to determine the amount of compensation plaintiffs are due will be scheduled by separate order.