**B.W. PARKWAY ASSOCIATES LIMITED PARTNERSHIP, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 539–89L.

United States Court of Federal Claims.

Oct. 15, 1993.

C. Elyse Vinitsky, Bethesda, MD, and Daniel G. Grove, Washington, DC, for plaintiff. Christine M. Sorge, of counsel.

Alan Brenner, U.S. Dept. of Justice, Land and Natural Resources Div., and Greg Mack, Nat. Sec. Agency, for defendant.

**OPINION**

MARGOLIS, Judge.

This takings case is before the court for final judgment after a four-day trial. The plaintiff, B.W. Parkway Associates ("BWPA"), is a partnership that owned property adjoining the National Security Agency ("NSA"), a United States Depart-

ment of Defense installation. The plaintiff alleges that the defendant, the United States, acting through NSA effected a Fifth Amendment taking by preventing BWPA from developing its property. The defendant argues that the plaintiff failed to develop the property either because of its own failures or because of obstacles to development. After reviewing the entire record, this court holds that the plaintiff has not met its burden of proof. Accordingly, the court directs entry of judgment for the defendant.

## FACTS

*I. Background*

During the early 1960s, Melvin J. Berman ("Berman"), a real estate developer, purchased several tracts of contiguous land located at the intersection of two highways, Maryland Route 32 (also known as Savage Road) and the Baltimore–Washington Parkway ("BW Parkway"). These tracts, which totalled almost 260 acres, came to be known collectively as "the Berman tract" or "Colony Fairfield." [1] The Berman tract was bordered on the west by the BW Parkway, on the south by Route 32, on the east by Fort George G. Meade, a Department of Defense facility, and on the north by privately owned vacant land. The attached map from plaintiff's trial exhibit (P's ex.) 89 shows the property's location and road network. Together with his partner, Jack Pollin, Berman formed BW Parkway Associates, a limited partnership, to develop the property. BWPA planned a mixed-use development, including commercial office buildings, retail establishments, high-rise apartments and single family homes. [2] Throughout the period at issue, though, the only tenants of the property were a motel, gas station and doughnut shop, and the remainder of the property was vacant.

The land is located in Anne Arundel County, Maryland. The Anne Arundel County government zoned it for a combination of commercial and residential uses.

Approximately 203 acres were zoned for residential uses. Up to 53 acres were zoned for high-density commercial uses. BWPA's development plans called for approximately 3000 residential units, 750,-000—1,000,000 square feet of office space, 150,000—200,000 square feet of other commercial uses and a 250–500 room hotel.

Dennis Berman testified that BWPA regarded the location of the property as extremely important. The property lay between three population centers: Baltimore, Maryland; Washington, D.C.; and Annapolis, Maryland, roughly equidistant from Baltimore and Washington. Moreover, two major highways, Route 32 and the Baltimore Washington Parkway, intersected at the property, and two other major highways U.S. Route 29 and Interstate 95, ran nearby. The record reflects that real estate development between Baltimore and Washington was "booming" during the period at issue.

Berman was particularly interested in the property because of its proximity to a large federal agency. The National Security Agency, a U.S. Department of Defense facility and tenant of Fort George G. Meade, adjoined the property to the east. NSA employed tens of thousands of persons from 1967–1987. According to Dennis Berman, having NSA next door was like "having a city next door. And this city needs services. All those people need a place to live, ... a place to shop." Trial Transcript (Tr.) at 43. BWPA considered the tract "the number one property in the [Baltimore–Washington] corridor." *Id.*

NSA officials regarded a large-scale development on the property as a threat to NSA's mission. NSA collects foreign intelligence for the United States. Its operations are secret, and a foreign government "would absolutely gain from knowledge of what was going on inside the facility." Tr. at 699. Officials feared that the development of certain types of buildings so close

---

1. The court will generally refer to the subject property as "the property."

2. During the period at issue, Berman bought out his partners in the Pollin family; thus, the court will refer principally to the activities of Berman and his son, Dennis Berman.

to the NSA would compromise national security by facilitating surveillance of NSA's operations.

BWPA never developed the property. In 1987, NSA condemned the property and paid BWPA more than $21 million. That award did not compensate BWPA for the value that development could have brought prior to the taking. BWPA alleges that, from 1968 to 1987, the NSA actively prevented it from developing the property in order to maintain a security buffer zone. According to BWPA, NSA benefited from keeping the property underdeveloped without compensating BWPA. NSA does not dispute that it opposed the development, but contends that it did nothing improper. NSA argues that typical obstacles to development, such as inadequate highway access and infrastructure, impeded BWPA's plans for the property.

The issue before this court is whether the government's conduct during the period 1968–1987 constituted a taking of property without compensation. The parties dispute several factual issues: the extent to which BWPA tried to develop the property; the feasibility of installing water and sewer systems on the property; and the nature of the government's opposition to development of the property. The court finds the following facts.

## II. BWPA's Efforts to Develop the Property

BWPA attempted to develop the property from 1967 to 1987. Developing unimproved land is a long, complex process. Several county agencies must approve aspects of a project, including water and sewer access, storm drains, roads, wetlands, flood plains, and zoning, before construction can begin. All such approvals must be current simultaneously for a developer to start work legally. It can take a developer several years to obtain approvals for a large-scale project.

BWPA planned the development and attempted to ascertain the feasibility of water and sewer systems over a period of years. Starting in 1967, BWPA hired engineering consulting firms to consider methods of providing water and sewer service, improving highway access to the property, and preparing subdivision plats. These efforts continued in the 1970s. BWPA also began acquiring approvals from various local government offices.[3] BWPA won sketch plan approval in December 1971, but did not prepare a preliminary plan. Thus, the sketch plan approval lapsed. From 1972 through 1974, BWPA worked with county officials to gain approval to install an interim sewage treatment plant on the property. The county granted approval in October 1974. Thereafter, BWPA sought estimates for site development to build an apartment building, an office building, and a water supply and waste disposal system. In 1975, BWPA hired an architect to design the buildings. From 1968 to 1975, BWPA officials negotiated with government officials to sell various interests in the property or exchange it for government-owned land.

In 1979, BWPA negotiated with at least one developer to form a joint venture to begin construction. By early 1979, BWPA again submitted a sketch plan proposal, and in August 1980, BWPA again gained sketch plan approval. BWPA officials actively monitored the state highway planning process and provided input.

BWPA came closest to beginning construction when it applied for and, in May of 1986, received a building permit from Anne Arundel County. In 1986, BWPA planned

3. Until 1985, Anne Arundel County had a three-stage process for reviewing planned developments. The first stage, called the sketch plan, required the developer to propose a "fairly detailed concept plan," showing a plan for using the land, including the location of buildings and infrastructure. Tr. at 627. At the sketch plan stage, several county offices reviewed the plan to determine if it "had a possibility of being approved, what county or state activities had the possibility of impacting on the development of the site, and what the developer was going to have to address in the additional planning review processes." Tr. at 627–28. The second stage, called the preliminary plan, required engineering work, a traffic impact study, and other studies. The developer had to prepare a final plan within one year after approval of the preliminary plan.

to join the Russett Joint Venture to build water and sewage facilities, and its participation in the joint venture remained a possibility until the government took the property in 1987. Thus, the record shows that BWPA made repeated efforts to overcome obstacles to developing its property, particularly during 1967–1975 and 1979–1987.

### III. Feasibility of Water and Sewer Access

The court finds that water and sewer access to the property were feasible during the period at issue. In 1967, a consulting firm concluded that BWPA could build permanent or temporary water and sewer systems on the property. BWPA won county approval to build water and sewage treatment facilities in 1974. By 1986, BWPA had concluded an agreement with other developers to form the Russett Venture to build common water and sewer systems. Nevertheless, consultants' reports and expert testimony establish that it would have taken BWPA several years to complete lines to serve the entire development.

Government officials genuinely doubted that BWPA could solve its water and sewer access problems. As early as February 1971, NSA officials stated that "the owner of the property will obviously have difficulty in the development of his land since water and sewage are a problem (he cannot get across Government property without permission) and the fact that he has only one access/egress to public roads." P's ex. 82. Government officials continued to believe that these obstacles prevented development as late as April 1986.

### IV. The Government's Actions

#### A. Early NSA Efforts to Purchase Interests in the Property

NSA officials opposed development on the property because they believed such development would facilitate surveillance of NSA operations. NSA performed several technical vulnerability studies of the property to assess the threat posed by development of the property. NSA officials concluded that the best way to protect NSA security would be to maintain a security buffer zone around the perimeter of NSA property. While NSA preferred the property to remain vacant, it found that it could maintain security by other methods, such as restricting building heights and location or limiting construction to buildings with public access.

Starting in April 1968, NSA attempted to acquire the property by exchanging government-owned real estate with BWPA. The General Services Administration ("GSA") represented NSA in negotiations with BWPA. GSA appraised the value of the property at $5,000,000. BWPA disagreed with the government's appraisal. By October 1969, GSA concluded that BWPA's estimate of the value of its property was "inflated," therefore "further efforts to effect an exchange [were] hopeless." P's ex. 49. Government representatives again approached BWPA about an exchange of property in June 1971, but Jack Pollin declined on behalf of BWPA.

NSA tried to acquire limited interests in the property. In 1970 NSA tried to purchase 75 acres of the property and an aerial easement on the rest. These efforts continued into 1971, but NSA was unable to obtain full funding for the purchase.

At the same time, NSA officials voiced opposition to the development to county officials. In August 1970, Marion McCoy, the County Planning and Zoning Officer, gave NSA information about BWPA's progress in obtaining county approvals for development. She explained that county "[z]oning people have been 'dragging their feet' because they hope that NSA will buy the land in question." She promised to " 'drag her feet' if [NSA were] interested in the land." P's ex. 62. During this period, NSA attended county planning meetings and kept abreast of development efforts. NSA's Chief of Installations and Logistics mentioned that "I don't think we should let an opportunity slip by to officially advise Anne Arundel of our concern for the construction of Colony Fairfield Apartment Complex adjacent to NSA." P's ex. 118. There is some evidence that McCoy opposed the development.

NSA sought an aerial easement in April 1972 to cover 136 acres of the property. In November 1972, the Army Corps of Engineers ("COE"), representing NSA, opened negotiations with BWPA. NSA and COE believed that unresolved conditions rendered the prospects for developing the property uncertain, including changes in zoning, proposed highway improvements, and continuing problems with access to the property. Negotiations continued into January 1974. Each side appraised the value of the property very differently, and valuation was complicated by proposed zoning changes. NSA and COE officials ultimately concluded that it would be too costly to acquire the property either by negotiation or by purchase.

After the failure of negotiations, NSA shifted its strategy. The government continued to believe that it would be difficult for BWPA to develop its property. NSA officials agreed to terminate negotiations with BWPA, but to "be alerted to any proposed development by the owners and ... take necessary action to impede any development not harmonious to the area." P's ex. 200. Officials instructed that "[a]ny structure that may create a nuisance or hazardous situation should be opposed by the Government in its capacity as a property owner." *Id.* Additionally, NSA officials planned to contact McCoy concerning "the Government's position and possible courses of action, if development of property creates adverse conditions." *Id.*

There is evidence that NSA planned to impede the development on the property by cultivating a relationship with at least one Anne Arundel County official and by using traffic concerns as a basis for its opposition. At a subsequent meeting, government officials recommended that "Fort Meade pursue a position that additional vehicular traffic resulting from occupants of developed enterprises on the [property] would add to a problem which now exists on the Fort Meade/NSA/CSS's traffic capability." P's ex. 202. NSA planned to

discuss NSA's concerns with McCoy for future development primarily because of an influx of traffic, to invite McCoy to NSA "as a prestige factor to express the appreciation of the Agency for her assistance," and to request the Secretary of Defense to instruct the Secretary of the Army to oppose construction of the property adjacent to NSA/Fort Meade. *Id.*

At least initially, NSA followed these plans. COE official Barry Frankel met with McCoy on April 2, 1975, and discussed the Agency's position concerning development on the property. NSA officials planned to actively oppose BWPA's development at county public zoning hearings.

## B. NSA's Involvement in Traffic Issues

The court finds that NSA became deeply involved with state officials in traffic planning issues. Starting in 1979, NSA officials attended public meetings and advised state highway planners on the Patuxent Freeway project.[4] NSA officials actively monitored the Maryland State Highway Administration's ("SHA") progress in developing alternative routes for the Patuxent Freeway, and in 1981 pressed for meetings with Maryland officials in order to affect the decisions. Commencing in the fall of 1981, NSA and Fort Meade officials worked very closely with SHA, holding frequent meetings to work out route alternatives. State officials attempted to satisfy NSA and Fort Meade desires with respect to the highway. In October 1982, an MDOT official stated that "coordination will continue after the [public] hearing to assure that Fort Meade's concerns are adequately resolved in order that we may develop a formal agreement between the State Highway Administration and the Department of the Army." P's ex. 308.

One reason for the close cooperation between federal and state planners was that the state needed an easement through federally-owned land in order to build the new

---

**4.** The Maryland Department of Transportation ("MDOT") planned the Patuxent Freeway to traverse the county east to west and approach the NSA complex. In June 1979, MDOT began to study proposals for locating the freeway and sponsored public meetings to gather information. The exact location of the highway was the subject of much debate and controversy.

freeway. There were other reasons for NSA's interest in the Patuxent Freeway. First, NSA was concerned about traffic congestion along Route 32. Contributing to the congestion were the large number of NSA employees entering and exiting the complex and the location of a major interchange between Route 32 and the BW Parkway. NSA officials worried that development of BWPA's property would worsen congestion by generating tens of thousands of vehicles per day. Second, NSA expressed concern that a major highway passing close to its complex could pose security risks.

In addition to the Patuxent Freeway project, highway planners perceived a need to improve the interchange between Route 32 and the BW Parkway. NSA was deeply involved in planning the interchange improvements. NSA and Fort Meade officials pressed state highway planners for traffic solutions that suited NSA, but which BWPA opposed. Specifically, NSA favored closing the intersection between the service road and Route 32. NSA favored building a road through the north end of BWPA's property to connect with Maryland Route 175 to provide access to BWPA's property. BWPA officials opposed this idea and wrote to congressmen to express concern that its access to Route 32 would be cut off. In an effort to relieve traffic congestion on Route 32, NSA suggested building an interchange from the BW Parkway directly into the NSA complex. This ramp, called the "connector road," bisected BWPA's property. NSA assumed overall responsibility for the connector road construction. Clearly, the connector road would have required BWPA to alter its development plans. BWPA argued that the exit ramp could serve both it and NSA, but NSA opposed this solution.

NSA exercised significant influence over highway planning decisions. The importance of NSA input is captured by a 1983 letter from the Governor of Maryland to BWPA explaining that he considered NSA's access to Route 32 a priority.[5]

## C. The Taking

In November 1985, BWPA notified NSA that it planned to begin construction on the property. NSA immediately applied for funding approvals to purchase the property. In a letter dated December 16, 1985, an NSA official informed BWPA that "the Government clearly will acquire that tract" and that "approval is expected to be forthcoming in the next 12 months." P's ex. 486. On December 2, 1985, NSA requested emergency funding for the acquisition.

NSA and COE had to secure several approvals to acquire the property. They had to obtain approval from the Assistant Secretary of Defense and congressional authorization to reprogram funds for the purchase, prepare a planning report and have it approved, and order an independent appraisal and have it approved. COE was not permitted to negotiate until funds were authorized to acquire the property. For the next year, NSA and COE continuously worked through channels to acquire funding. An independent appraisal valued the property between $9.4 million and $9.7 million. The Assistant Secretary of Defense notified NSA on July 10, 1986 that the funding request met the criteria for emergency funding, and later the Secretary of Defense approved $9.7 million for the emergency acquisition. After following additional procedures necessary to receive funding approval, on September 30, 1986, the Deputy Secretary of Defense notified congressional committees of the proposed acquisition. The documents reflect that government officials acted as quickly as they could to gain funding approvals, but that the approval process was cumbersome.

On May 20, 1986, BWPA received its building permit and pursued plans to join the Russett Joint Venture to build water and sewer facilities. An NSA official asked BWPA to delay construction until

---

5. As Governor Hughes explained, "it is simply not possible to provide even minimally acceptable access to Maryland Route 32 from both the massive National Security Agency complex and your development in the space of just a few hundred feet, with both access points being immediately adjacent to the Baltimore–Washington Parkway interchange." P's ex. 330.

June 15, 1986 to allow NSA time to acquire authorization for funding. On June 19, 1986, NSA reaffirmed its commitment to take the property. In October 1986, NSA sent a letter to BWPA's lawyer explaining the process and reaffirming interest in the purchase. Finally, in November 1986, congressional committees notified NSA that they did not object to the funding, and $9.7 million was approved for the acquisition.

NSA officials opened negotiations with BWPA sometime in late November/early December 1986. Negotiations halted when government officials, who thought the appraisal might be too high, ordered an additional appraisal. Berman became frustrated and wrote to the NSA Director asking for a commitment to purchase the property. Berman also wrote to various congressmen expressing his concern at the lack of progress. The government's reply assured him that the government was taking the property.

Negotiations restarted in July 1987. Negotiations reached an impasse by July 28, 1987, and in October 1987 the government instituted eminent domain proceedings.

## DISCUSSION

### I. Statute of Limitations

█ Defendant raises a statute of limitations defense. The statute of limitations is six years. 28 U.S.C. § 2501. The limitations period first accrues or begins to run when a potential plaintiff knows or reasonably should know of all the events which fix the government's alleged liability. *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir.1988). If an injury is clear but its source unknown, the six-year period starts when the plaintiff has reason to know the cause of the injury. *L.E. Cooke Corp. v. United States*, 27 Fed.Cl. 753, 754 (1993); *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538, 544–45 (1988).

█ This lawsuit is well within the statute of limitations. BWPA claims that the totality of the government's conduct amounted to a taking of the property. The only evidence of a taking about which

BWPA could have known before December 16, 1985 were the government's alleged threats to condemn the property. The evidence supporting BWPA's theory in this case consisted of internal government documents to which BWPA had no access until it conducted discovery. A mere threat to condemn cannot form the basis of a Fifth Amendment taking. *Mesa Ranch Partnership v. United States*, 2 Cl.Ct. 700, 707 (1983). Therefore, a mere threat to condemn cannot constitute all the events which fix the government's liability.

The court finds that the earliest time at which BWPA might have been aware of its claim was December 16, 1985, the date of the letter from NSA to BWPA stating unequivocally that "the Government clearly will acquire that tract." P's ex. 486. That letter, coupled with BWPA's nearly twenty-year history of frustrated efforts to develop the property, could have raised awareness that the government might have taken action to prevent the development. Thus, the time at which the limitations period ended was in December 1991, two years after BWPA filed its complaint with this court.

### II. Nature of Plaintiff's Cause of Action

### A. Tort

█ The defendant argues that BWPA's claims allege tortious conduct, not a taking. Courts consider three factors to determine whether alleged government conduct constitutes a taking or a tort. First, the government's conduct is more likely to sound in tort if it is unauthorized or unlawful. Lawful or authorized government conduct may be a taking. *See B & F Trawlers, Inc. v. United States*, 27 Fed.Cl. 299, 303–04 (1992); *Clark v. United States*, 8 Cl.Ct. 649, 651 (1985). Second, the government's conduct is more likely to constitute a taking if its consequences are natural, probable or foreseeable. *Clark*, 8 Cl.Ct. at 651; *Berenholz v. United States*, 1 Cl.Ct. 620, 627–28 (1982), *aff'd*, 723 F.2d 68 (Fed.Cir. 1983). Finally, courts consider the nature of the plaintiff's injuries. If a plaintiff claims incidental injuries, the cause of ac-

tion is more likely to sound in tort. In contrast, if a plaintiff alleges permanent or continuing injuries, the cause of action is more likely to be a taking claim. *Clark*, 8 Cl.Ct. at 651; *Berenholz*, 1 Cl.Ct. at 627.

█ The court finds BWPA's allegations support a taking claim for several reasons. First, BWPA does not suggest that the government acted illegally. Rather, BWPA contends that the government acted pursuant to lawful military policy. Though BWPA implies that the government violated statutes requiring expeditious acquisition of property, that is only tangential to this case. Second, BWPA alleges that the government acted intentionally and, in fact, the natural and foreseeable consequence of the government's conduct was to obstruct development of the property. Finally, BWPA alleges an injury of a continuing nature: it claims that the government prevented it from developing the property for almost twenty years.

## B. Taking

█ The Fifth Amendment guarantees that private property shall not "be taken for public use without just compensation." U.S. Const. amend. V. The guiding principle underlying takings jurisprudence is that, "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922). A takings inquiry requires the court to balance the private and public interests. A government action effects a taking if it "does not substantially advance legitimate state interests ... or denies an owner economically viable use of his land." *Agins v. Tiburon*, 447 U.S. 255, 260–61, 100 S.Ct. 2138, 2141–42, 65 L.Ed.2d 106 (1980).[6] Un-

der a takings analysis, the court must consider three factors: (1) the character of the governmental action; (2) the extent to which the regulation interferes with distinct investment-backed expectations; and (3) the economic impact of the regulation on the claimant. *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986) (citations omitted). Each factor is examined *seriatim*.

## The Character of the Government's Conduct

The court draws inferences as to the character of the government's actions from the basic facts of the case. It is clear that NSA desired to maintain a buffer zone around its perimeter and preferred to control the development. The evidence that the government's actions actually prevented development, however, is conflicting. The court evaluates each of BWPA's allegations.

BWPA alleges that the government negotiated in bad faith. BWPA bases this charge on three claims. First, BWPA asserts that the government tried to acquire only those portions of the property that BWPA focused on for development and stopped its efforts to acquire the property as soon as BWPA stopped trying to develop it. Second, BWPA maintains that the government offered less than it knew the property was worth. Finally, BWPA argues that the government failed to act expeditiously to acquire the property.

The evidence does not support these claims, and the court concludes that the government did not negotiate in bad faith. There is insufficient evidence that the government targeted for purchase those por-

---

**6.** The facts of this case do not raise a *per se* takings analysis because BWPA does not allege either a permanent physical occupation, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), or a confiscatory regulatory action, *Lucas v. South Carolina Coastal Council*, —— U.S. ——, ——, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). Under the *Lucas* framework, a "landowner whose deprivation is one step short of complete ... might not be able to claim the

benefit of [a *per se* taking category], but ... '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations'" are still relevant to determining whether there has been a taking. *Lucas*, —— U.S. at —— n. 8, 112 S.Ct. at 2895 n. 8 (citation omitted). BWPA has not established that it lost all economically beneficial use of the property.

tions of the property that BWPA readied for development. Rather, the government targeted for purchase those interests that impacted heavily on its security concerns. For example, the government considered purchasing aerial easements over the property, and limitations to restrict construction to public buildings.

There is insufficient evidence that the government dropped its acquisition efforts solely because BWPA stopped its efforts to develop. In contrast, the evidence supports the inference that the government dropped its efforts to acquire the property because it could not reach agreement with BWPA. GSA officials commented that BWPA's appraisal of the property was "inflated." P's ex. 49. Plaintiff's exhibit 200 shows that the government fully analyzed the negotiations, believed BWPA would demand more money than the government could afford, and dropped its efforts to acquire the property because it believed that it would be difficult for BWPA to overcome its water and sewer obstacles.

There is no evidence that the government offered BWPA less than it knew the property was worth. The evidence shows, however, that government officials genuinely believed that the property was worth less than BWPA officials believed it was worth. As one official stated in 1969, "the owners ... have advised that their property is worth about $20,000,000 to them. This figure is obviously far from the actual value of the property." P's ex. 49. The government's 1972 appraisal of the value of an aerial easement estimated the value at $350,000, and that is the amount that the government offered to purchase it. Similarly, during the 1987 negotiations for purchase, the government had authority to pay up to $9.7 million for the property, and it offered $9.2 million to BWPA.

Moreover, the government did not fail to act expeditiously to purchase the property. During the negotiations between 1968 and 1975, the government did not purchase the property because it could not reach agreement with BWPA. During 1985 through 1987, the government acted as quickly as it could given the cumbersome process of gaining funding authorization. There is little support for BWPA's repeated assertion that the government had approval to purchase the property throughout the period in question.

BWPA also alleges that the government exercised enormous influence over the county approval process, influencing state and county officials to oppose the development. BWPA claims that the government notified the county that NSA planned to acquire part of the property, persuaded county employees to "drag their feet" in granting approvals, and practically dictated the highway designs so as to use traffic problems to prevent the development.

The court finds that the government did, in fact, notify the county that NSA intended to purchase 75 acres of the property. Further, the court finds that the government attempted to influence the decisions of county officials. NSA and Fort Meade officials attended county meetings concerning the development. They cultivated a relationship with Marion McCoy, a county zoning official. BWPA officials perceived that McCoy opposed the development, and they felt they had to guard against her influence. However, there is conflicting evidence of the overall effect of NSA's influence on county officials. One document states that the county would "continue to process [the] subdivision until a *definite* commitment by Fort Meade has been made on [the] property." P's ex. 105 (emphasis in original). Another document suggests that county officials were "dragging their feet" about granting approvals in the hope that the government would acquire the tract. P's ex. 62. There was testimony that the approval process took an unusually long time for BWPA; while most sketch plans are approved within several months if there are no problems, approval for one of BWPA's sketch plans took over two years. Yet BWPA never failed to gain the approvals that it sought. Twice it received sketch plan approval. Once it received approval for an interim sewage treatment facility. Once it received a building permit. In light of the evidence, the court concludes that NSA attempted to influence the

county approvals process through both public opposition and private persuasion. While the government's influence could have delayed some approvals, it never prevented them.

The court finds that the government's influence over the highway designs did not impede the development. The government intended to use traffic concerns as a reason for opposing the development. Plaintiff's exhibit 202 reflects that NSA officials recommended that "Fort Meade pursue a position that additional vehicular traffic resulting from occupants of developed enterprises on the Baltimore Washington Parkway property would add to a problem which now exists on the Fort Meade/NSA/CSS's traffic capability." However, there is insufficient evidence that NSA influence over the traffic issues actually poisoned BWPA's development efforts. MDOT officials recognized that problems would ensue from the combination of traffic from NSA and Colony Fairfield. Maryland officials actively considered access to the property when they generated proposals for the Patuxent Freeway. Even if BWPA's access to Route 32 were closed, an alternative access route was available: extending Old Clark Road to Route 175. While BWPA opposed this alternative access, there is no evidence that the alternative access would have prevented the development.[7]

Finally, BWPA claims that the government threatened to condemn the property. In December of 1985 NSA stated its intention to condemn the property and in June of 1986 it asked BWPA to delay its construction plans. The government followed both of these actions with the eminent domain proceedings filed in October 1987.

■ Legitimate government action which impairs the market value of real property ordinarily does not amount to a taking. *Kirby Forest Indus., Inc. v. United States*, 467 U.S. 1, 15, 104 S.Ct. 2187, 2196, 81 L.Ed.2d 1 (1984). In *Kirby*, the Court did not find a taking when the government filed a notice of *lis pendens*, notifying the public that it had instituted condemnation proceedings, even though the notice reduced the market value of the property. *Id.* at 7, 104 S.Ct. at 2192. Observing that filing a notice of *lis pendens* was a legitimate governmental action that did not "interfere[ ] with an owner's legal right to dispose of his land," the Court reasoned that "[u]ntil title passed to the United States, [the landowner] was free to make whatever use it pleased of its property." *Id.* at 15, 104 S.Ct. at 2196. In accordance with this principle, courts have held that a threat of condemnation by the United States was not a taking even if it tended to thwart a proposed development. *Mesa Ranch Partnership*, 2 Cl.Ct. at 707. Nor was it a taking if the United States cut off the best highway access from a property, so long as other access routes were available. *Id.* at 709. In *De-Tom Enters., Inc. v. United States*, 213 Ct.Cl. 362, 552 F.2d 337 (1977), the fact that government officials spoke at a public hearing against a proposed zoning change on a piece of private property did not support a taking claim. The court analogized the government to a powerful adjoining landowner, such as "a large private manufacturer or comparable enterprise, or an organized group of citizens." 213 Ct.Cl. at 365, 552 F.2d 337.

At the other extreme, government conduct which goes beyond legitimate government action and interferes with the legal rights of landowners may constitute a taking. *Althaus v. United States*, 7 Cl.Ct. 688, 694 (1985). In *Althaus*, the court found a taking because the government substantially eliminated all markets and uses for a parcel of land, and then purposefully offered to purchase the land for a fraction of its value. Similarly, government conduct amounted to a taking when the government completely and purposefully deprived a landowner of all highway access to his property, thereby preventing

7. Plaintiff's traffic expert, William Baumgaertner, relied on these and other documents to conclude that the government's activity on the traffic issues impeded development. The court has reviewed the documents that Baumgaertner relied on and reaches different conclusions for the reasons stated.

any chance for it to develop the property. *Drakes Bay Land Co. v. United States,* 191 Ct.Cl. 389, 401, 411, 424 F.2d 574 (1970).

Many of the government's actions in this case fall under the category of legitimate government actions that normally do not constitute a taking. First, the government negotiated in good faith, but unsuccessfully, to purchase the property. Good faith negotiations to purchase property do not constitute a taking. *Mesa Ranch Partnership,* 2 Cl.Ct. at 708. Second, the government opposed the development during county meetings. Speaking against the development at public meetings and contacting public officials are typical actions of concerned neighbors who oppose development, and do not constitute a taking. *De–Tom Enters.,* 213 Ct.Cl. at 365, 552 F.2d 337. Third, the government informed county officials of NSA's intent to purchase the property. The government may state its intention to condemn property without effecting a taking. *Mesa Ranch,* 2 Cl.Ct. at 707. Fourth, the government took almost two years to secure funding approvals to purchase the property. Here, as in *Kirby,* the government's stated intention to acquire the land may have had the effect of reducing the market value for the property. Nevertheless, BWPA remained free to make whatever use of the property that it pleased until title passed to the United States. Finally, the government did not take the property until its development was imminent. The government, however, had no obligation to purchase the property until it agreed to do so. Moreover, government officials genuinely doubted the plaintiff's ability to develop the property and thus had no reason to acquire it until development became imminent.

Some of the government's actions may not fall under the rubric of legitimate actions. Government officials wielded substantial influence over the state highway planning decisions and intended at one point to use highway issues to persuade county officials to reject the development. Government officials also cultivated a relationship with one county zoning official in order to enlist her support against the development. Assuming, *arguendo*, these actions impaired BWPA's ability to develop its property, they could support a taking claim. The court will next examine the extent to which these governmental actions interfered with BWPA's reasonable investment-backed expectations.

*Interference With Reasonable Investment–Backed Expectations*

First, the court must determine whether the plaintiff's expectations for development were reasonable. The court finds that, though BWPA's hopes for developing the property were reasonable to some extent, there were no guarantees that it would have been able to achieve full development within a reasonable time period. BWPA's hired consultants concluded that building water and sewer service were feasible but would have taken several years. Further testimony showed that developers of the KMS building, which was completed in 1990 on property close to the BWPA tract, had difficulty finding tenants. That example suggests that there was no guarantee of successful development. Thus, the court concludes that BWPA's investment-backed expectations were reasonably possible but not certain to be fulfilled.

Next, the court must determine whether the government's actions actually prevented BWPA from developing the property. Most of the government's actions did not impede development; rather, BWPA officials chose not to pursue development aggressively. First, there is no support for BWPA's contention that the government negotiated in bad faith merely to induce BWPA to stop its development. The court has found previously that the government did not negotiate in bad faith. Second, if BWPA ceased its development efforts because it hoped the government would acquire the property, that was BWPA's choice. Third, there is insufficient evidence that alleged threats to condemn the property actually prevented the development. Though Dennis Berman testified that it is difficult to obtain financing or sell the property under a threat to condemn, the record contains no evidence that BWPA

was rejected for a loan due to government threats nor that potential buyers declined to buy it because of government threats. Moreover, Berman admitted that BWPA could have built pieces of the development without outside financing. Fourth, BWPA lacks evidence that the government's influence over any of the traffic-related issues actually impeded the development. Though NSA wanted to close one access route to the property, another access route was available. There is no taking so long as some access route was available. *Mesa Ranch Partnership*, 2 Cl.Ct. at 709. In addition, the county authorities approved BWPA's sketch plans, and BWPA obtained a building permit. The court finds little evidence that the government's plans to build the connector road impaired BWPA's development efforts.

Finally, there is insufficient evidence that the government's opposition to the development during the county approvals process actually impeded the development. NSA may have used its relationship with Marion McCoy to slow down the county zoning approvals. However, the evidence is inconclusive as to whether the government's influence caused a delay. While testimony indicated that one of BWPA's sketch plan approvals took longer than usual, BWPA twice won sketch plan approval, once gained approval for an interim sewage treatment plant and obtained a building permit. Thus, BWPA has not established by a preponderance of the evidence that the government substantially interfered with the approvals process for the development.

BWPA argues that the totality of the government's actions made it risky for BWPA to prepare its property for development because BWPA knew it could not recover preparation costs from the government through an eminent domain proceeding. Thus, according to BWPA, it risked losing money if it started to develop and the property was taken; yet if BWPA did not develop the property, the government would not have taken it.

This argument assumes, without support, that the government's taking was in-

evitable. The court is not persuaded that the taking was a foregone conclusion. At least once previously, the government failed to gain funding approval to purchase a limited interest in the property. Also previously, the government had attempted to purchase limited interests in the property, leaving some portions available for development. NSA officials also desired to acquire the entire property. However, the record fails to support the inference that at all times NSA officials could gain approval for the purchase. Moreover, this fact tends to undermine BWPA's position, because it suggests that BWPA controlled whether the property would have been taken or developed. In *Kirby Forest*, the Court observed that

> any effort by petitioner to develop the land probably would have prompted the Government to ... to file a declaration of taking.... But the likelihood that the United States would have responded in that fashion ... weakens rather than strengthens petitioner's position, because it suggests that petitioner had the option, at any time, to precipitate an immediate taking of the land.

467 U.S. at 15–16, 104 S.Ct. at 2196–97. The same analysis applies here. If BWPA had begun construction, the government would have attempted to secure funding to acquire the land. If the government failed to acquire the land, then BWPA would have completed its development. In fact, it was BWPA's letter to NSA indicating that development was imminent that precipitated the government's efforts in 1985 to obtain funding to take the property.

*The Economic Impact of the Government's Action*

Because the court finds that the government's actions did not actually interfere with the development, it also concludes that the government's actions had little economic impact on BWPA. Several factors buttress this conclusion. The government offered the plaintiff several opportunities to avoid a taking by selling its land or interests in the land. This distinguishes this case from *Drakes Bay*. In *Drakes*

*Bay,* the court held that the government completely precluded development when it acquired the only piece of land that could connect the subject property to highways. Once it acquired this land, the government refused to permit road construction and refused to purchase the subject property. 191 Ct.Cl. at 411, 424 F.2d 574. Here, by contrast, the government never could have stopped the development completely. By its own admission, BWPA made business decisions to stop its development efforts when it believed the government would acquire the land. BWPA could at all times have precipitated a taking, or achieved development if it had continued its efforts to do so.

The case also differs from *Althaus.* In *Althaus,* the government deliberately offered less than it knew the land was worth, and created an environment wherein landowners could neither sell nor use their property. 7 Cl.Ct. at 694–95. Here, however, evidence shows that the government offered close to the value of appraisals performed by independent consultants.

Moreover, BWPA remained free to attempt to develop its land if it wished. Thus, BWPA was not deprived of a market for its property. Courts have stressed that there is no taking if the plaintiff remained free to sell the property or to develop the property to some extent. *Mesa Ranch,* 2 Cl.Ct. at 709; *De–Tom Enters.,* 213 Ct.Cl. at 370, 552 F.2d 337.

Thus, BWPA has not established by a preponderance of the evidence that the government's conduct caused BWPA to fail to develop its property and suffer economic loss as a result.

## CONCLUSION

After a thorough review of the evidence presented at trial and the entire record, the court concludes that plaintiff has not established a taking by a preponderance of the evidence. Accordingly, the court finds for the defendant. The Clerk is directed to enter judgment for the defendant and dismiss plaintiff's complaint. No costs.